UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
UNITED STATES OF AMERICA,                    **MEMORANDUM AND ORDER**

            -against-                                    07-CR-587 (CBA)

TIMOTHY DONAGHY,

                          Defendant.
--------------------------------------------------------X
UNITED STATES OF AMERICA,

            -against-                                    08-CR-86 (CBA)

JAMES BATTISTA and THOMAS
MARTINO,

                          Defendants.
--------------------------------------------------------X
AMON, United States District Judge:

I.      Introduction

        On August 15, 2007, in case number 07-CR-587, defendant Timothy Donaghy pled

guilty to both counts of a two-count Information alleging conspiracy to commit wire fraud in

violation of 18 U.S.C. § 1349 and conspiracy to transmit wagering information in violation of 18

U.S.C. § 1084.  Thereafter, in case number 08-CR-86, on April 16 and 24, 2008 respectively,

Donaghy's two co-conspirators, Thomas Martino and James Battista, entered pleas of guilty.

Martino pled guilty to conspiracy to commit wire fraud, and Battista pled guilty to conspiracy to

transmit wagering information.  As a victim of these conspiracies, the National Basketball

Association ("NBA") and the United States on its behalf, seek restitution pursuant to the

Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A.  Alternatively, as to

defendant Battista, restitution is sought pursuant to the Victim and Witness Protection Act of

1982 ("VWPA"), 18 U.S.C. § 3663, the MVRA's discretionary counterpart.  For the reasons that follow, the Court concludes that the NBA is entitled to restitution in the total amount of $217,266.94, to be imposed jointly and severally in part and apportioned in part as set forth herein.

II.      Factual Background

     A.      The Pleas

     For thirteen years, up to and including the 2006-07 season, Donaghy was an NBA referee.  During the 2003-04 season, Donaghy began to provide betting recommendations, or "picks," for NBA games, including games he officiated, to his friend, Jack Concannon.  These bets were then placed by Concannon, on behalf of him and Donaghy, with a bookmaking service.  Concannon, in an effort to conceal Donaghy's involvement, represented to the service that he was betting alone.  The scheme between Donaghy and Concannon continued until November 2006,[1] during which time the two men placed bets on approximately 30 to 40 games annually.

     Eventually, Concannon failed in his efforts to prevent Donaghy's gambling activity from being discovered.  In December of 2006, defendants James Battista and Thomas Martino approached Donaghy and informed him that they were aware that he had been placing bets on NBA games, including games he had refereed.  Battista proposed an arrangement whereby Donaghy would provide picks on NBA games to Battista through Martino.  In making these picks, Donaghy was to utilize his access to certain non-public information, including the identity

_____

[1]Apparently, after a hiatus, the Donaghy/Concannon scheme rekindled for a brief period in February of 2007, when the two men gambled on approximately five games together.

of officiating crews for upcoming games, the interactions between certain referees and team personnel, and the physical condition of certain players. Rather than betting his own money as he had done with Concannon, Donaghy would simply be paid a fee by Battista through Martino for a correct pick. Martino would often deliver the cash payments. Concannon was not a part of this arrangement.

After the Donaghy/Battista/Martino conspiracy came to the government's attention, Donaghy approached the government and cooperated with its investigation. Thereafter, on August 15, 2007, he pled guilty to a two-count Information. In the "Introduction" section, the Information states:

> Approximately four years ago, DONAGHY began placing bets on NBA games, including games he officiated. Beginning in approximately December 2006, DONAGHY began to receive cash payments in exchange for providing betting recommendations or "picks" on NBA games, including games he officiated, to individuals involved in the business of sports betting.

(Information ¶ 7.) The Information then proceeds to the two applicable Counts, alleging conspiracy to commit mail fraud and to transmit wagering information, therein describing in detail the 2006-07 conspiracy Donaghy entered into with Battista and Martino. (Information ¶¶ 8-14.) Neither Count mentions the 2003-2006 gambling arrangement between Donaghy and Concannon. The overt acts alleged in support of the two conspiracy Counts take place on December 13, 14, and 26, 2006, and March 11, 2007, and are alleged to have been in furtherance of the Donaghy/Battista/Martino conspiracy. (Information ¶ 15.) There are no acts alleged regarding the Donaghy/Concannon arrangement.

At the plea hearing, the Court asked Donaghy to describe in his own words what he did in connection with the charges in Counts One and Two. He stated:

In December, 2006, I was employed as a referee with the National Basketball Association. As an employee, I was subject to rules of conduct established by the NBA, including a prohibition on betting on professional sporting events. In addition, as a referee, I was given access to master referee schedules that included the identities of officiating crews for particular games. This information was confidential and not available to the general public. I also was aware of the manner in which officials interacted with players and called games as well as the condition of players prior to a game. By having this non-public information, I was in a unique position to predict the outcome of NBA games.

Beginning in December, 2006 until about April, 2007, I agreed with other individuals to use this non-public information in order to pick NBA teams that I predicted would win particular games and also cover the point spreads set by professional bookmakers. As part of our agreement, others would in turn use my picks in order to place bets with bookmakers on the teams I had selected. I received cash payments for successful picks but would not lose any money if a pick did not win and cover the point spread. Some of my picks included games I had been assigned to referee.

(Donaghy Plea Tr. at 21.) Donaghy did not refer to the betting arrangement he had made with

Concannon. A subsequent discussion ensued regarding the scope of the conspiracies to which

Donaghy had just pled guilty:

[THE GOVERNMENT]: If I could make one point of clarity, it is alleged in the information in addition to the two crimes that the defendant has now pled guilty to, that he did himself place bets on NBA games. I didn't want there to be confusion. I think he would acknowledge that. That was not part of the charge. It was not part of the charged conduct and the conspiracy in Count Two. It is conduct in which he engaged.

THE COURT: Is there any dispute about that?

[DEFENSE COUNSEL]: Your Honor, I'm not sure of the relevance at this point in terms of the allocution, but there is not a factual dispute as to what was said.

THE COURT: Let me ask, does the government believe that I need to make any further inquiry to establish a factual basis for the plea to either Count One or Count Two?

[THE GOVERNMENT]: We do not, your Honor.

[DEFENSE COUNSEL]: Your Honor, let me clarify one thing that Mr. Seigel

said. There is nothing in this information that suggests Mr. Donaghy personally placed any bets. The allegations relate to conspiracy charges which I think have been allocuted. I don't want there to be any misunderstanding on the record in terms of what he's pleading to or the conduct he's pleading to.

THE COURT: The heart of the allegation, as I understand it, with respect to Count One, is that he was providing recommendations and information for the purposes of others who were engaged in sports betting.

[DEFENSE COUNSEL]: That more accurately describes.

THE COURT: That's what's charged, correct?

[THE GOVERNMENT]: Right. I want to say because there's an allegation in here that Mr. Donaghy doesn't dispute, that he has been betting on NBA games himself for three years.

THE COURT: Where?

[THE GOVERNMENT]: Paragraph 7. *I wanted to make clear while he was independently betting on games, the conspiracy charge in which he was paid for his picks is Count One and the related conspiracy Count Two. That's separate from the other conduct which is alleged but not part of the essential elements of the two counts.*

(Donaghy Plea Tr. at 25-26 (emphasis added).)

The following April, Martino and Battista pled guilty. On April 16, 2008, Martino pled guilty to participating in the same wire fraud conspiracy that Donaghy had been involved in. He described his crime as follows:

Between mid-December 2006 and early April 2007, I agreed with James Battista and Tim Donaghy to pay Tim Donaghy, an NBA referee, for non-public information to which he had unique access by virtue of his position as an NBA referee about games that he was scheduled to referee. Mr. Donaghy would provide me with the name of the team he believed was a good pick for gambling purposes. I knew that Mr. Donaghy was violating the rules that governed his NBA employment by providing this information. That information was relied on by Mr. Battista to place gambling wagers on NBA teams. If Donaghy's pick won he was paid for his information. He was not paid if his pick lost. On most occasions I would receive that information from Mr. Donaghy by telephone and then relay that information to Mr. Battista by telephone. On December 13, 2006,

I spoke with Mr. Donaghy by telephone regarding his pick for an NBA game. On December 14th, Mr. Donaghy and I met in Pennsylvania where I gave him a cash payment for his information. On December 26th, I spoke with Mr. Donaghy by telephone and again received his pick on an NBA game. On March 11, 2007, I met with Mr. Donaghy in Toronto, Canada and gave him a cash payment. During the investigation of this case I testified that I did not relay information I received from Mr. Donaghy to Mr. Battista and that was not truthful.

(Martino Plea Tr. at 23-24.)

On April 24, 2008, Battista pled guilty to conspiracy to transmit wagering information, the same conspiracy to transmit wagering information that Donaghy had pled guilty to. He described his crime as follows:

I, James Battista, of sound mind and will from December of 2006 to March 2007, I was engaged in the business of sports betting, and I agreed with Tom Martino and Tim Dona[ghy] to use the telephone across state lines to obtain information to assist me in wagering on sporting events, on NBA basketball games. I received information from Tom Martino, who received his information from the NBA referee Tim Dona[ghy]. This agreement was formed during a meeting between the three of us, in a hotel in December of 2006. During the Course of this agreement from time to time I directed Mr. Martino to do certain things such as having meetings with Mr. Dona[ghy].

THE COURT: Overt Act B says, that on December 14, 2006, that you and Battista met with the NBA referee, who is Mr. Dona[ghy], is that correct?

THE DEFENDANT: Yes.

THE COURT: You met in Pennsylvania and gave him cash?

THE DEFENDANT: Yes, your Honor, I did.

THE COURT: You did that?

THE DEFENDANT: Yes, I did, your honor.

THE COURT: Now, you used the telephone. Did you also use the telephone for the purpose of transmitting bets and wagers and information involving bets and wagers?

THE DEFENDANT: Yes, your Honor, I did.

THE COURT: Did you use it interstate, did you call from state to state?

THE DEFENDANT: Yes, your Honor, I did.

(Battista Plea Tr. at 19-20.)

The overt acts contained in the indictment for the wagering conspiracy make clear that, although criminalized by two separate provisions of the United States Code, the same underlying conduct was at issue:

> In furtherance of this conspiracy and in order to accomplish the objectives thereof, the defendants JAMES BATTISTA and THOMAS MARTINO, together with others, committed and caused to be committed, among others, the following overt acts:
>     a. On or about December 13, 2006, MARTINO spoke with the NBA referee by telephone regarding the NBA referee's pick for an NBA game.
>     b. On or about December 14, 2006, BATTISTA and MARTINO met with the NBA referee in Pennsylvania and gave a cash payment to the NBA referee.
>     c. On or about December 26, 2006, MARTINO spoke with the NBA referee by telephone regarding the NBA referee's pick for an NBA game.
>     d. On or about March 11, 2007, MARTINO met with the NBA referee in Toronto, Canada, and MARTINO gave a cash payment to the NBA referee.

(Indictment ¶ 15.)

B.    Request for Restitution and Ensuing Litigation

Despite an inquiry from the Probation Office months earlier, the NBA did not seek restitution until June 5, 2008 when it wrote to Brandon Maxon, the probation officer assigned to these cases. It was a blanket undifferentiated request for one million dollars from the defendant Donaghy, for: (1) compensation and benefits for the 2006-07 season; (2) fees and expenses paid to outside counsel to represent the NBA in responding to and participating in the prosecution of the offense and to attend proceedings related to the offense; (3) expenses associated with an internal investigation; and (4) transportation and expenses incurred for interviewing 57 NBA referees as a part of the internal investigation.

-7-

On June 10, 2008, Donaghy responded by applying for a subpoena pursuant to Federal Rule of Criminal Procedure 17(c) for production of every conceivable document in the NBA's possession underlying the expenses sought. By letter dated June 17, 2008, the NBA submitted further support for its restitution request and took the position that the paperwork submitted rendered the request for the Rule 17(c) subpoena moot. The NBA now determined for the first time that it was entitled to an additional $395,104.89, for a total of $1,395,104.89. This increase appears to have been based principally on a change in position that they were entitled not only to a proportional share of Donaghy's compensation for the 2006-07 season but also for the preceding three seasons. The NBA also itemized the amount of money it was seeking for each category of what it believed were compensable costs and expenses and provided some documentation in support of its request.

On June 25, 2008, the Court conducted a hearing on Donaghy's application for the Rule 17(c) subpoena as well as other issues pertaining to restitution. At the hearing, the Court rejected as non-compensable the NBA's costs for an internal investigation, in particular its requests for the expenses associated with the interviews of the 57 referees. This amount was expressly sought pursuant to subsection (b)(4) of the MVRA, 18 U.S.C. § 3663A(b)(4). The Court determined that the costs of the NBA's internal investigation, which were not incurred in the course of assisting the government with its investigation into or prosecution of Donaghy's offenses, were outside the scope of subsection (b)(4).

In light of the subpoena, the Court also directed the NBA to submit further documentation in support of its request. Thereafter, in a submission dated June 27, 2008, the NBA modified its request to seek three "categories" of restitution: (1) $577,312.89, representing

Donaghy's compensation for the portions of the 2003-04, 2004-05, 2005-06, and 2006-07 seasons during which he officiated games in which he had a financial interest; (2) $150,793, representing the attorneys' fees of Wachtell, Lipton, Rosen & Katz ("Wachtell") and Arkin Kaplan Rice LLP ("Arkin"), who served as the NBA's counsel in connection with the NBA's assistance to the government in its investigation and prosecution of these offenses; and (3) $9,930.02, representing that portion of the salaries of NBA employees which was attributed to reviewing, at the government's request, the tapes of games that Donaghy refereed. Donaghy responded to the NBA's revised request by letter dated June 30, 2008, arguing that the NBA was not entitled to restitution in the amount of Donaghy's compensation for the 2003-06 time period, that the NBA overpaid outside counsel in assisting the government's investigation and prosecution of his offense, and that the NBA's requests were vague and unsubstantiated. On June 30, 2008, the Court issued an Order which directed the NBA to organize its data and coordinate the affidavits with the time sheets. The NBA responded on July 1, 2008.

Thereafter, the Court called a telephone conference for July 2, 2008 to alert the parties to an issue that none had addressed; namely, the potential liability of co-conspirators Battista and Martino for the restitution sought by the NBA. This oversight by the parties resulted in the adjournment of the sentences to permit defendant Battista additional time to review the submissions and address the issues as they pertained to him. Having conducted that review, Battista contends that he cannot be ordered to pay any restitution because the NBA is not a "victim" of the conspiracy to which he pled guilty under either the MVRA or the VWPA. Alternatively, he argues that the conspiracy to which he pled guilty is not covered by the MVRA, and the Court should not impose restitution pursuant to the VWPA. In the event that these

arguments fail, he adopts all of Martino's arguments regarding amount and apportionment. Martino acknowledges that he is liable for restitution but disputes the amounts sought by the NBA either because in his view they do not pertain to his conduct or because they are too vague and unsubstantiated to be recoverable.

III.    Discussion

    A.    Liability of the Defendants Under the Restitution Statutes

        1.    The NBA is a "Victim" of Battista's Crime

Battista's first argument is that he should not be ordered to pay restitution, under either the MVRA or the VWPA, because the NBA was not a "victim" of his offense, conspiracy to transmit wagering information. The definition of "victim" is the same in both statutes:

> For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. §§ 3663(a)(2); 3663A(a)(2). Courts have noted that this definition, which was amended to its present form in 1990, is broad.[2] See, e.g., United States v. Jewett, 978 F.2d 248, 253 (6th Cir. 1992); United States v. Rand, 403 F.3d 489, 493-95 (7th Cir. 2005).

In this case, Battista pled guilty to conspiring with Martino and Donaghy to transmit wagering information. One of the key features of this conspiracy was that Donaghy was able to gain a wagering advantage for Battista by using confidential information belonging to the NBA in the course of providing him with "picks" on games he refereed. On these facts, the NBA is

---

[2]This amendment, and the caselaw which prompted it, will be discussed in more detail in section III.C.1.a, *infra*.

clearly a "victim" of Battista's wagering conspiracy. See, e.g., United States v. Brock-Davis, 504 F.3d 991, 998-1000 (9th Cir. 2007) (hotel owner was a "victim" of a methamphetamine conspiracy because he incurred cleanup costs in a room where the drug was being manufactured).

2. Battista's Crime is Covered by the MVRA

The defendants Donaghy and Martino do not dispute that the MVRA applies to the offenses to which they entered guilty pleas, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. This is an "offense against property" within the meaning of the MVRA, because it is an offense committed by fraud or deceit. See 18 U.S.C. § 3663A(c)(1)(A)(ii); United States v. Sensmeier, 361 F.3d 982, 987-88 (7th Cir. 2004). Battista argues that he is not subject to this provision since the crime to which he pled, conspiracy to transmit wagering information in violation of 18 U.S.C. § 1084, is not an offense committed by fraud or deceit, and therefore is not covered by the MVRA.

The resolution of this issue turns on whether the language "committed by fraud or deceit" refers to the elements of an offense or the manner in which the defendant commits the offense. If it is the former, Battista prevails. If it is the latter, as the government argues, he is subject to the MVRA and must pay restitution. Neither party has provided any caselaw that addresses the issue. A plain reading of the statute suggests that the government has the better argument since the phrase "committed by fraud or deceit" appears to refer to the way in which a particular offense was carried out rather than its elements. Accordingly, on the unique facts of this case, where the success of Battista's wagering was dependent on Donaghy's fraudulent conduct, this Court concludes that Battista is subject to the MVRA.

### 3. Battista May be Ordered to Pay Restitution Pursuant to the VWPA

Alternatively, Battista is accountable for restitution pursuant to the VWPA. The VWPA provides that the court, when sentencing "a defendant convicted of [any offense under Title 18 and others], may order ... that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1)(A). In determining whether or not to order restitution pursuant to the VWPA, the district court must consider (1) the amount of the loss sustained by each victim as a result of the offense, (2) the financial resources of the defendant, (3) the financial needs and earning ability of the defendant and the defendant's dependents and (4) such other factors as the court deems appropriate. 18 U.S.C. § 3663(a)(1)(B)(I). "Courts are statutorily required to consider the enumerated restitution factors, but not to make detailed factual findings as to each factor." United States v. Stevens, 211 F.3d 1, 6 (2d Cir. 2000). The Second Circuit has held that, although it is not mandatory, the purpose of section 3663 "is to require restitution whenever possible." United States v. Porter, 41 F.3d 68, 70 (2d Cir. 1994) ("Porter I") (citing United States v. Atkinson, 788 F.2d 900, 903 (2d Cir. 1986)); see also United States v. Jacques, 321 F.3d 255, 261 (2d Cir. 2003); United States v. Porter, 90 F.3d 64, 68 (2d Cir. 1996) ("Porter II"); U.S.S.G. 5E1.1(a)(1) (stating that "[t]he court *shall* enter a restitution order if such order is authorized" under 18 U.S.C. § 3663).

Although the financial resources of the defendant are one of the mandatory section 3663(a) considerations, even a defendant with no present ability to pay can still be ordered to do so pursuant to section 3663. As the Second Circuit has explained:

> A defendant's limited financial resources at the time restitution is imposed is not dispositive of whether restitution is proper, see [United States v. ]Mortimer, 52 F.3d [429] 436 [(2d Cir. 1995)], particularly where the defendant has a reasonable potential for future earnings. Thus, "[e]ven an indigent defendant may be subject

to the duty to pay restitution when and if funds are eventually acquired." [Porter
II], 90 F.3d at 70; see United States v. Ismail, 219 F.3d 76, 78 (2d Cir. 2000) (per
curiam) (present indigency not a barrier to restitution order where future earning
power exists). Furthermore, in the absence of a defendant showing a restricted
future earnings potential by a preponderance of the evidence, it is entirely
reasonable for a district judge to presume future earnings in ordering restitution.
See, e.g., 18 U.S.C. § 3664(e) ("The burden of demonstrating the financial
resources of the defendant and the financial needs of the defendant ... shall be on
the defendant.").

United States v. Ben Zvi, 242 F.3d 89, 100 (2d Cir. 2001) (ellipses and one alteration in

original); see also Jacques, 321 F.3d at 262; Porter I, 41 F.3d 70 ("It is well established that

the indigency of a defendant does not per se preclude the ordering of restitution.").

In this case, an analysis of the pertinent factors dictates that Battista be responsible

together with his co-conspirators for restitution to the NBA. The Court has in the succeeding

discussion identified with some degree of precision the loss to the victim NBA. As to the

defendant's resources, Battista's presentence report indicates that he has assets totaling $676,300

in the form of a residence worth approximately $600,000, $68,000 in various checking and

savings accounts, and the remaining $7,500 in the value of a 1998 Dodge Caravan and a 2000

Dodge Durango. His sole liability is the $120,000 balance of his mortgage, which will be fully

paid in 2017. His household's monthly income is $1,800, which is the sum of his wife's salary

and assistance from other family. His household's monthly expenses total $4,830, resulting in a

monthly negative cash flow of $3,030. Currently, Battista stays home with his three children

while his wife works. His wife has indicated that Battista has expressed interest in opening a

catering business, and his presentence report reflects that he has previous experience in the

restaurant business. He certainly has a reasonable potential for future income. Accordingly,

Battista should have sufficient resources to contribute to the payment of restitution to the NBA.[3]

In addition to the factors specifically identified in section 3663(a)(1)(B)(I), the Court is also permitted to consider "such other factors as the court deems appropriate."  18 U.S.C. § 3663(a)(1)(B)(i)(II).  One important consideration is the need, where possible, to insure equality of treatment of similarly situated defendants.  The conduct underlying Battista's offense is the same conspiracy factually that Donaghy and Martino pled guilty to.  The mere fact that this conduct is criminalized by at least two different provisions of the United States Code–one that is clearly covered by the MVRA and another where its applicability may be less clear–should not lead to the result that two co-conspirators are required to pay restitution while a third, the organizer of the conspiracy, is not, simply because he pled guilty to a different count of the indictment.  Accordingly, because Battista and his family have some financial resources and he has earning potential, and because it would be unjust to require only two out of three participants in a single conspiracy to pay restitution to its only identified victim, the Court concludes that defendant Battista is liable to pay restitution pursuant to the VWPA.

B.      General Restitution Principles

The Court now turns to the NBA's restitution requests.  Federal courts have no inherent power to award restitution.  They may only do so when authorized by statute.  United States v. Gottesman, 122 F.3d 150, 151 (2d Cir. 1997); United States v. Akande, 200 F.3d 136, 138 (3d Cir. 1999); United States v. Dickerson, 370 F.3d 1330, 1335 (11th Cir. 2004).  Here, restitution

---

[3]Battista's conclusory assertion that he "is under severe financial strains at this time" is insufficient to meet his burden of demonstrating his financial limitations, and, as is explained above, the Court would not be precluded from ordering Battista to pay restitution even if he were presently indigent, as long as he possessed the potential to earn a living in the future.

is being awarded pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[4]  In all respects relevant to

the ensuing discussion, sections 3663 and 3663A are identical, and the Court relies on cases

interpreting both provisions.  See United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000);

United States v. Mahone, 453 F.3d 68, 74 n.3 (1st Cir. 2006) (citing cases); Dickerson, 370 F.3d

at 1338; United States v. Randle, 324 F.3d 550, 556 n.3 (7th Cir. 2003); United States v. Quillen,

335 F.3d 219, 222 n.4 (3d Cir. 2003).

    The basic principles of restitution are well-settled.  The government bears the burden of

proving the amount of loss sustained by the victim by a preponderance of the evidence.  See 18

U.S.C. § 3664(e); United States v. Reifler, 446 F.3d 65, 122 (2d Cir. 2006).  A restitution award

need only to be a reasonable estimate of the victim's actual losses.  See United States v.

Germosen, 139 F.3d 120, 129-30 (2d Cir. 1998); United States v. Burdi, 414 F.3d 216, 221 (1st

Cir. 2005); United States v. Futrell, 209 F.3d 1286, 1292 (11th Cir. 2000); United States v.

Sapoznik, 161 F.3d 1117, 1121-22 (7th Cir. 1998) (district judge's estimate of 25% of the

defendant's salary not an abuse of discretion where no more precise number could be easily

determined).  Although estimates are appropriate, a court must base its restitution award on more

than mere speculation about a victim's actual losses.  See United States v. Catoggio, 326 F.3d

323, 329 (2d Cir. 2003).  Uncertainties with respect to the amount in question should be resolved

in favor of the victim in accord with the statutory focus on making the victim whole.  See United

States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006) ("[R]estitution attempts to compensate for

loss by restoring the victim to a position he occupied before the injurious event."  (internal

_____

[4]Section 3664 governs the procedure for the issuance and enforcement of a restitution
order and expressly applies to orders issued pursuant to both sections 3663, the VWPA, and
3663A, the MVRA.

quotations and alterations omitted)); United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002)

(observing "the statutory focus on the victim's losses and upon making victims whole").

Because the three defendants pled guilty to conspiring with one another, they are liable to

pay restitution for acts of their co-conspirators committed in furtherance of the conspiracy.  See

Boyd, 222 F.3d at 50-51; United States v. Nichols, 169 F.3d 1255, 1278 (10th Cir. 1999); United

States v. Plumley, 993 F.2d 1140, 1142 (4th Cir. 2993).  The co-conspirators can be held to be

proportionately or jointly and severally liable for restitution payments.  See 18 U.S.C. § 3664(h);

United States v. Klein, 476 F.3d 111, 114 (2d Cir. 2007); United States v. Nucci, 364 F.3d 419,

422 (2d Cir. 2004).  The choice among these two options is a discretionary one for the Court.

See Nucci, 364 F.3d at 422 (citing section 3664(h)).  With these general principles in mind, the

Court now turns to the NBA's specific restitution requests.

C.      The NBA's Restitution Requests

1.      Donaghy's Compensation

Pursuant to subsection (b)(1) of both restitution statutes,[5] the Court may award

restitution, in the cases of an offense against property, in the amount of the victim's loss.  The

proper measure of "loss" is the value of the property wrongfully taken by the defendant.  See 18

U.S.C. §§ 3663(b)(1)(B), 3663A(b)(1)(B); Sapoznik, 161 F.3d at 1121.  Here, the NBA seeks to

recover losses representing the portion of Donaghy's compensation that was paid for the games

he refereed dishonestly during the 2003-04, 2004-05, 2005-06, and 2006-07 seasons.  The Court

must first address whether or not the NBA can recover for losses incurred for all four of these

---

[5]Hereinafter, where the Court simply refers to "subsection (_)," it is citing a provision
that can be found, at a corresponding location, in both section 3663 and section 3663A.

seasons.

a.  Recovery is Only Available for the 2006-07 Season

Although the precise amount is the subject of some debate, it is not disputed that the NBA is entitled to recover certain compensation paid to Donaghy for games he refereed during the 2006-07 season for which he provided picks to Battista and Martino. What is in dispute is whether the NBA can recover from Donaghy[6] his compensation for certain games during the 2003-04, 2004-05, and 2005-06 seasons, prior to the formation of his criminal relationship with Battista and Martino. On this point the government agrees with the defendants that the compensation paid to Donaghy for the earlier seasons is not recoverable. It is only the NBA that continues to press this issue.

In Hughey v. United States, the Supreme Court addressed the question of whether the provisions of the VWPA "allow a court to order a defendant who is charged with multiple offenses but who is convicted of only one offense to make restitution for losses related to the other offenses." 495 U.S. 411, 412-13 (1990). At the time, the VWPA allowed district courts to order a defendant to "'make restitution to any victim'" of the offense.[7] Id. at 412 (quoting the VWPA as it read in 1990). Hughey had been indicted for three counts of theft by a United States Postal Service employee and three counts of use of unauthorized credit cards, but had pled guilty to only one of the counts, for using an unauthorized credit card on a particular occasion. Id. at 413-14. Nevertheless, the district court had ordered Hughey to pay restitution for losses

---

[6]The government does not seek restitution on the NBA's behalf against Battista and Martino for the losses claimed to have been suffered during the 2003-06 time period.

[7]At the time of the Hughey decision, the relevant provision of the VWPA resided at 18 U.S.C. § 3579, rather than at § 3663.

stemming from the use of at least 20 other credit cards on separate occasions.  Id. at 414.  The
Supreme Court reversed, holding that "the language and structure of the [VWPA] make plain
Congress' intent to authorize an award of restitution only for the loss caused by the specific
conduct that is the basis of the offense of conviction."  Id. at 413.

Hughey's application in the case of a crime involving only a single instance of conduct,
like the unauthorized use of a credit card on a given day, was, and remains, fairly
straightforward.  In Hughey's wake, however, a circuit split emerged regarding its application in
mail fraud cases that involve a scheme or pattern of fraudulent behavior.  Several circuits,
representing the majority, took the position that Hughey stood for the proposition that restitution
was only available with respect to the particular conduct charged and proven.  See United States
v. Cronin, 990 F.2d 663, 666 (1st Cir. 1993) (joining the majority view and citing cases from the
Third, Sixth, Ninth, Tenth, and Eleventh circuits).  Only two circuits, the Fifth and Seventh,
concluded that Hughey's "offense of conviction" language referred to the mail fraud scheme as a
whole, making restitution available for all acts done pursuant thereto, whether charged and
proven or not.  See id. (citing United States v. Stouffer, 986 F.2d 916, 928 (5th Cir. 1993) and
several cases from the Seventh Circuit).

In 1990, Congress amended the VWPA's definition of "victim" to include:

a person directly and proximately harmed as a result of the commission of an
offense for which restitution may be ordered including, *in the case of an offense
that involves as an element a scheme, conspiracy, or pattern of criminal activity,
any person directly harmed by the defendant's criminal conduct in the course of
the scheme, conspiracy, or pattern.*

18 U.S.C. §3663(a)(2) (Supp. III 1997) (emphasis added).[8]  Upon enacting the MVRA in 1996,

Congress included an identical subsection (a)(2).  See Boyd, 222 F.3d at 50-51 (noting that the

MVRA definition of "victim" traced the VWPA definition verbatim and applying VWPA

caselaw in a MVRA case); Dickerson, 370 F.3d at 1338 ("Because §§ 3663 and 3663A define

'victim' in precisely the same way, we look to cases interpreting either statute.").  Conspiracy to

commit wire fraud, the offense to which Donaghy pled guilty, is an offense involving as an

element a scheme, conspiracy, or pattern of criminal activity.

As presently enacted, "the VWPA [and the MVRA] confer[] authority to order a

participant in a conspiracy to pay restitution even on uncharged or acquitted counts."  Boyd, 222

F.3d at 51; see also Dickerson, 370 F.3d at 1338-39 (noting that, with its definition of "victim,"

Congress broadened a district court's authority to grant restitution); United States v. Hensley, 91

F.3d 274, 277 (1st Cir. 1996) (court can order restitution where an element of the offense is a

scheme, conspiracy, or pattern of conduct "without regard to whether the particular criminal

conduct of the defendant which directly harmed the victim was alleged in a count to which the

defendant pled guilty, or was even charged in the indictment"); United States v. Henoud, 81 F.3d

484, 488 (4th Cir. 1996) (after the 1990 amendments, courts "allow broader restitution orders

encompassing losses that result from a criminal scheme or conspiracy, regardless of whether the

defendant is convicted for each criminal act within that scheme"); United States v. Kones, 77

F.3d 66, 70 (3d Cir. 1996) ("[Subsection (a)(2)] expanded the district court's restitution powers

... to the extent that a district court could order restitution for any harm directly caused by the

---

[8]Though cases like Cronin and Stouffer were decided after 1990, they applied pre-
amendment law because they involved defendants whose crimes had been committed prior to the
1990 adoption of the amendment.

defendant's criminal conduct in the course of the scheme, conspiracy, or pattern, even though such conduct is not the specific conduct that is the basis of the offense of conviction.") (internal quotations omitted).

Although subsection (a)(2) takes the broader of the two post-Hughey views, it only permits recovery for conduct that was part of the applicable scheme, conspiracy, or pattern of conduct that is the offense of conviction.[9] See United States v. Wright, 496 F.3d 371, 381 (5th Cir. 2007) ("[W]here a fraudulent scheme is an element of the conviction, the court may award restitution for actions *pursuant to that scheme*.") (internal quotations omitted); Dickerson, 370 F.3d at 1341 (concluding that "a criminal defendant cannot be compelled to pay restitution for criminal conduct committed outside of the scheme, conspiracy, or pattern of criminal behavior underlying the offense of conviction"); Akande, 200 F.3d at 141 ("[T]he 'offense of conviction,' as defined by Hughey[], remains the reference point for classifying conduct that determines liability for restitution."); United States v. Welsand, 23 F.3d 205, 207 (8th Cir. 1994) (noting that while the 1990 amendment expanded the definition of the term "victim," it did not "extend the contours of the word 'offense,'" and therefore that restitution was available only for "all acts encompassed within the 'scheme or artifice to defraud'" that was the basis of the offense of conviction); Hensley, 91 F.3d at 277-78 (determining whether certain conduct was part of the single, "unitary scheme" that was the basis of conviction in order to determine if restitution was properly awarded); United States v. Pepper, 51 F.3d 469, 473 (5th Cir. 1995) ("Because a

_____

[9]By way of comparison, the standard for "relevant conduct" for the purposes of section 1B1.3 of the United States Sentencing Guidelines is broader. See United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000); Wright, 496 F.3d at 381. "Relevant conduct" extends beyond losses caused by schemes that are elements of the offense of conviction to include losses attributable to "the same course of conduct." United States v. Silkowski, 32 F.3d 682, 687 (2d Cir. 1994).

fraudulent scheme is an element of [the defendant's] offenses of mail and wire fraud, *actions pursuant to that scheme* are conduct underlying the offense of conviction.") (emphasis added).

Therefore, in order to determine whether or not certain conduct may be the subject of a restitution order, a court must ask whether or not it is "engaged in [in] furtherance of the scheme, conspiracy or pattern" that was as element of the offense of conviction. Kones, 77 F.3d 66, 70 (3d Cir. 1996). In this case, Donaghy was convicted of participating in a conspiracy with Battista and Martino in which Donaghy provided picks in exchange for flat rate payments when those picks were correct. Accordingly, the Court is tasked with determining whether or not Donaghy's conduct during the 2003-04, 2004-05, and 2005-06 seasons was engaged in furtherance of that conspiracy.

There is little case law interpreting the scope of a given conspiracy for section 3663A(a)(2) purposes. It is useful, therefore, to consult case law interpreting the scope of a conspiracy outside of the restitution context. See Hensley, 91 F.3d at 278 (citing factors used to determine whether conduct is part of a unitary "scheme" from "analogous caselaw on duplicitous indictments and variance of proof"). The Second Circuit has held that, "[i]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004) (internal quotations omitted); see also United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990). "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." Geibel, 369 F.3d at 689 (internal quotations omitted); see also Maldonado-Rivera, 922 F.2d at 963. In addition, "a single conspiracy is not transformed into multiple conspiracies

merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." United States v. Berger, 224 F.3d 107, 114-15 (2d Cir. 2000) (internal quotations omitted).

In making this inquiry in the context of examining whether or not the government has offered sufficient proof of a conspiracy, the Second Circuit has focused on "what agreement, if any, the jury could reasonably have found to exist vis-a-vis each [co-conspirator]." United States v. Johansen, 56 F.3d 347, 351 (2d Cir. 1995). Thus, for example, in the context of a narcotics conspiracy, the Second Circuit has held that where multiple groups are operating, a single conspiracy exists so long as "the groups share a common goal and depend upon and assist each other, and [the court] can reasonably infer that 'each actor was aware of his part in a larger organization where others performed similar roles.'" Berger, 224 F.3d at 115 (summarizing and quoting United States v. Bertolotti, 529 F.2d 149, 154 (2d Cir. 1975)).

Donaghy's conduct during the 2003-04, 2004-05, and 2005-06 seasons was not part of the conspiracy to which he pled guilty. There was no agreement, or common goal or plan, between the arrangement entered into between Concannon and Donaghy during the previous seasons on the one hand, and Battista and Martino and Donaghy on the other. There was also no mutual dependence and assistance between the Concannon scheme and the Battista/Martino conspiracy. The four men formed no "larger organization." Rather, Donaghy was merely placing personal bets on NBA games through Concannon. This activity, which occurred from 2003 until 2006, did not serve to further the interests of the offense of conviction, a conspiracy which did not yet exist. In fact, as is recited above, the parties made a point at Donaghy's plea hearing to note that the offense of conviction was the conspiracy entered into between Donaghy,

Battista, and Martino, and that the scheme Donaghy and Concannon engaged in before that time was not at issue. The government confirms this analysis in its letter to the Court of July 7, 2008, in which it states "the offenses of conviction ... do not extend to Donaghy's betting with Concannon before the 2006-07 season." (7/7/08 Letter at 7.)

The NBA advances the argument that Donaghy's conduct during the three prior seasons was part of an overall scheme engaged in by Donaghy from 2003-07. This argument misses the mark. Donaghy's offense of conviction was not this broad scheme to defraud the NBA, but rather, a narrower conspiracy to enter into a scheme with Battista and Martino, the unlawful goal of which was to defraud the NBA. Although section 3663A(a)(2) does allow for recovery for uncharged or acquitted conduct that is part of the scheme, conspiracy, or pattern of criminal conduct *that was an element of the offense of conviction*, it does not allow for recovery for what are acts in furtherance of a broader uncharged scheme being carried out alone by one of the co-conspirators.

The cases cited by the NBA, Hensley among them, are cases involving a single defendant charged with engaging in a broad scheme, rather than a conspiracy, and are distinguishable on that basis. For instance, in Hensley, the defendant, acting alone, engaged in a scheme whereby he would order computer equipment on behalf of a fictitious company and then abscond with it. 91 F.3d at 275. The defendant pled guilty to, among other things, mail and wire fraud. Id. at 275 & n.1. After his plea, the government learned that, in addition to the charged conduct, the defendant had ordered computer equipment from an additional computer company and had it sent to a different mailing location "belonging to" a different fictitious company. Id. at 275-76. Because a scheme was an element of the offense of conviction, the First Circuit relied on case

law seeking to determine whether or not given conduct is part of a unitary scheme: "[I]n determining whether particular criminal conduct comprised part of a unitary scheme to defraud, the sentencing court should consider the totality of the circumstances, including the nature of the scheme, the identity of its participants and victims, and any commonality in timing, goals, and modus operandi." Id. at 278. The court found that the defendant engaged in a "unitary scheme" "by renting the two drop boxes at [Mail Boxes, Etc.] locations in Boston within two days of one another, placing all the fraudulent orders for goods with computer-products suppliers (similar victims) within less than two weeks, using interstate wires in each instance, and 'paying' for the goods with counterfeit instruments." Id. Hensley is distinguishable because, in that case, the offense of conviction was a broad scheme engaged in by only the defendant, whereas here, the offense of conviction is limited to a course of conduct that was agreed upon among co-conspirators. This distinction runs through the other cases cited by the NBA as well[10]–the offenses of conviction were "schemes," rather than conspiracies, and were drawn broadly enough to include the additional conduct at issue. None of these cases stand for the proposition that, where a conspiracy is the offense of conviction, conduct outside the scope of that conspiracy is recoverable pursuant to 18 U.S.C. § 3663A(a)(2), merely because the conspiracy itself might be a portion of a broader uncharged personal scheme of one of the conspirators. Accordingly, the Court declines to include in the restitution award the NBA's request for $504,719.15 for the 2003-04, 2004-05, and 2005-06 seasons.

b.      Amount Recoverable

---

[10]The NBA also cites United States v. Wright, 496 F.3d 371 (5th Cir. 2007); United States v. Smith, 218 F.3d 777 (7th Cir. 2000); United States v. Hart, 1997 U.S. App. Lexis 2339 (2d Cir. Feb. 10, 1997); United States v. Dickerson, 370 F.3d 1330 (11th Cir. 2004).

The Court now turns to the issue of the amount of Donaghy's compensation which should be awarded to the NBA to compensate it for the losses it sustained during the 2006-07 season. Subsection (b)(1) provides that, in the case of a crime which results in loss or damage to property, the victim is entitled to either the return of the property, or, if return of the property is impractical, the value of the property. See 18 U.S.C. §§ 3663(b)(1), 3663A(b)(1). Courts have established that subsection (b)(1)'s conception of "loss" encompasses only actual losses directly resulting from the offense of conviction. See Germosen, 139 F.3d at 120; United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000); Quillen, 335 F.3d at 222. Accordingly, what the common law knows as "consequential damages" are not recoverable. See United States v. Phillips, 477 F.3d 215, 224 (5th Cir. 2007); United States v. Barton, 366 F.3d 1160, 1167 (10th Cir. 2004); United States v. George, 403 F.3d 470, 474 (7th Cir. 2005); Quillen, 335 F.3d at 222. Consequential damages are losses "beyond those which naturally and directly flow" from the defendant's conduct. Boccagna, 450 F.3d at 120 (internal quotations omitted). Whereas here, the defendant is an employee who was compensated under the false pretense that he was rendering honest services to his employer, the correct measure of loss is the amount of the defendant's compensation that was paid for the portion of his services that were dishonest. See Sapoznik, 161 F.3d at 1121. In this case, it is undisputed that Donaghy dishonestly refereed 16 games during the 2006-07 season, and a corresponding portion of his compensation for these games is the appropriate measure of the NBA's loss.

The defendants argue, however, that compensation other than his salary–for instance, his expenses for flights and room and board–should not be recoverable. No legal authority is cited in support of this proposition. To the same extent that the NBA suffered loss in the form of

salary payments for dishonest services, so too did it suffer loss when it paid Donaghy's expenses for traveling to games at which he did not perform his services honestly. There is no logic to the argument that these losses were less "direct" than the payment of his salary. Therefore, these expenses will be included in the loss calculation.

The defendants have raised an issue which does merit discussion. They have pointed out that Donaghy's playoff compensation was greater, per game, than his regular season compensation, a distinction which, assuming that he did not provide picks for any of the playoff games, renders the NBA's and the government's calculations incorrect. The Court ordered the government to advise it whether any of the games that Donaghy refereed dishonestly were playoff games and to provide a breakdown of the number of regular season versus playoff games that he refereed. The government responded by letter dated July 17, 2008, and stated that Donaghy refereed 68 regular season games during the 2006-07 season, and five playoff games. The government further stated that all 16 of the games that Donaghy refereed after providing a "pick" to Battista and Martino took place during the regular season. Accordingly, the Court will calculate the NBA's 2006-07 loss exclusively as a percentage of his regular season salary.

Based on the numbers supplied by the government, Donaghy refereed 16 out of 68 regular seasons games, or just over 23.5%, after providing a pick to Battista and Martino. That percentage multiplied by his total regular season compensation of $286,211.67[11] yields a loss amount, rounded to the nearest penny, of $67,343.92. This amount represents the NBA's "loss"

_____

[11]This number was derived from Exhibit A to the NBA's submission of June 27, 2008 by subtracting the last five entries on the chart for the 2006-07 season, which the Court assumes represent Donaghy's total compensation for the 2007 NBA playoffs, from the total figure of $358,431.62.

under subsection (b)(1).  The defendants are liable to pay it jointly and severally.

2.     Investigation Costs

In addition to allowing for recovery for "property loss," the MVRA and VWPA both permit recovery for "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. §§ 3663(b)(4); 3663A(b)(4).  Courts have taken a broad view of subsection (b)(4)'s scope.  See United States v. Gordon, 393 F.3d 1044, 1056-57 (9th Cir. 2004).  These "investigation costs" are recoverable so long as they are a "direct and foreseeable result of the defendant's wrongful conduct."  Id. at 1057 (internal quotations omitted); United States v. Fogel, 494 F. Supp. 2d 136, 140-41 (D. Conn. 2007).  The NBA requests recovery for the legal fees it incurred when it enlisted the help of two law firms to represent it as it assisted the government's investigation and prosecution of these offenses, and for the costs of having NBA employees review video of games that Donaghy refereed during the 2006-07 season.  The NBA has stated on the record that it is seeking these costs solely pursuant to subsection (b)(4).  The Court will address each request in turn.

a.     Attorneys' Fees

Attorneys' fees are recoverable pursuant to subsection (b)(4) when they are incurred as an investigation cost.[12]  See Gordon, 393 F.3d at 1056-57; United States v. Hayward, 359 F.3d

---

[12]In his July 18, 2008 letter to the Court, defendant Battista argues that several jurisdictions have held that attorneys' fees and costs are not recoverable.  He cites United States v. Diamond, 969 F.2d 961, 968 (10th Cir. 1992); United States v. Patty, 992 F.2d 1045, 1049 (10th Cir. 1993); United States v. Mullins, 971 F.2d 1138, 1147 (4th Cir. 1992); United States v. Mitchell, 876 F.2d 1178, 1184 (5th Cir. 1989); United States v. Arvanitis, 902 F.2d 489, 497 (7th Cir. 1990); and United States v. Barany, 884 F.2d 1255, 1261 (9th Cir. 1989).  None of these cases support his argument, because they are all cases analyzing attorneys' fees under the "loss"

631, 642 (3d Cir. 2004); <u>United States v. Cummings</u>, 281 F.3d 1046, 1052-53 (9th Cir. 2002);

<u>Fogel</u>, 494 F. Supp. 2d at 139-40.  Although attorneys' fees in this case are generally recoverable

as investigation costs, the defendants contest certain portions of the fees sought.  Those

challenges fall into one of two broad categories.  First, in some instances, they argue that a

portion of the legal fees sought by the NBA should not be recoverable at all, either because the

records are so vague that the government failed to establish the amount of those fees by a

preponderance of the evidence, because the fees are excessive, or because a portion of the fees

were not incurred as a direct and foreseeable result of the investigation into or prosecution of the

defendant's wrongful conduct.  Second, there is a series of expenses that each defendant argues

he should not be responsible for, pursuant to the Court's authority to forgo joint and several

liability and instead apportion costs.

i.    Expenses Challenged as Unrecoverable

All of the defendants argue that the government has generally failed to establish the

amount of the investigation costs, because the time sheets, affidavits and charts provided by the

NBA's outside counsel are too vague.  The government need only establish these amounts by a

preponderance of the evidence.  Moreover, the Court, where a precise number cannot be

calculated, may award a reasonable estimate to the victim in accord with the goal of the

restitution statutes which is to make the crime victim whole.  The defendants' claim that the

records are too vague for any type of analysis is unpersuasive.  The billing records are

---

provision of subsection (b)(1), and observing that, generally speaking, attorneys' fees fall on the
"consequential damages" side of the actual/consequential divide.  All of these cases, the most
recent being <u>Patty</u>, decided in 1993, were decided before Congress enacted subsection (b)(4) in
1994, which explicitly provides for the recovery of the cost of assisting the government's
investigation into or prosecution of the offense.

accompanied by affidavits which explain what each attorney and paralegal for whom restitution is sought was doing and how it related to assisting the government in the prosecution of these offenses. In some cases, a given attorney or paralegal has explained that only a portion of a billing entry was dedicated to assisting the government, and has given his or her best estimate as to how many hours are recoverable. It is only these portions of those entries that the NBA now seeks. The defendants have not identified a single billing entry that is not mentioned in the affidavits. The Court has reviewed the affidavits in their entirety, and finds that, while not extremely detailed, they are sufficient to establish by a preponderance of the evidence that the amounts requested are a reasonable estimate of the costs the NBA incurred while assisting the government in the prosecution of these offenses.

In addition to arguing that outside counsel's records are insufficient to establish the amounts recoverable, the defendants argue that the amounts charged were excessive. Since the goal of restitution is to make the victim whole, there is an argument to be made that as long as the Court is satisfied that the attorneys' fees were incurred for the purpose of assisting the government in the investigation and prosecution of these offenses, and were in fact paid by the victim, the Court need go no further. Specifically, it need not further examine the request with the proverbial green eyeshade as it might do in reviewing a fee application of a prevailing party in a civil case to determine whether the hours were reasonably spent or the hourly rates appropriate. On the other hand, it could also be argued that although reasonable attorneys' fees are a "direct and foreseeable" investigation cost within the scope of subsection (b)(4), excessive attorneys' fees are not. Even assuming that the Court has a duty to scrutinize the attorneys' fees pursuant to subsection (b)(4), performing that task in this case does not suggest that they were

excessive.

First, while the defendants persistently assert that "multiple" lawyers participated in each task, a review of the affidavits and time records reveals that the document productions and witness interviews were not overstaffed. It appears that one associate prepared each set of witness interview preparation materials, and accompanied one partner to a preparation session with the witness and to the interview itself. The records further reflect that only one or two associates and one or two paralegals worked on each of the several document productions under the supervision of one partner. After carefully reviewing the records, and bearing in mind its own firsthand knowledge of what it had asked of the NBA, the government advised the Court that the staffing and amount of hours spent by outside counsel appeared to be a reasonable response to the assistance it requested. (See 7/9/08 Tr. at 37-38.) The Court has reviewed the records and agrees that they do not raise any red flags suggesting excessive fees. Moreover, the defendants have not provided any basis for this Court to conclude that Wachtell and Arkin, both reputable law firms, engaged in over-billing. Accordingly, the Court will not reduce the restitution award on the basis that this matter was over-staffed or otherwise over-billed.

Although all of the defendants argue that outside counsel over-charged the NBA in one way or another, they do not seem to argue, at least in their papers, that the hourly rates charged by outside counsel were unreasonable. At most, defendant Donaghy alluded to this argument at the July 9, 2008 hearing, where he suggested that Wachtell was too prominent a law firm to have been hired to do the work associated with the government's investigation and prosecution of these offenses, but even that comment was made in the context of an argument that Wachtell had assigned too many lawyers to work on particular tasks. (7/9/08 Tr. at 31.) No defendant has

cited any authority on this point or otherwise suggested what more appropriate rates should be. It is only the government that discusses this issue, and it apparently concludes that the rates are within parameters that are sufficiently reasonable to allow the Court in its discretion to accept them.

Without purporting to set any new standards for appropriate hourly rates in civil attorneys' fees cases, the Court does not find that the hourly rates charged in this case were excessive. The NBA hired two well-known corporate law firms in one of the world's most expensive markets, New York City. Wachtell charged either $600, $700, or $750 per hour for David Anders, a partner, between $380-$580 per hour for the associates, and $175-$200 per hour for paralegals.[13] These amounts are in line with the rates charged by most of New York City's major corporate law firms. See Miele v. New York State Teamsters Conf. Pension & Retirement Fund, 831 F.2d 407, 409 (2d Cir. 1987) (district court may rely on its own knowledge of hourly rates in the market). The NBA is the type of major commercial organization that would likely hire law firms like Arkin and Wachtell, a consequence that should have been foreseeable to the defendants. Accordingly, the Court finds that the hourly rates paid by the NBA in rendering assistance to the government's investigation of these offenses were not excessive.

Finally, the defendants argue that certain billing entries for the services of Wachtell Partner David Anders on August 13, 14, and 15, 2007, which reflect that they are, in part, for his time consulting with the NBA regarding its public response to Donaghy's guilty plea, are not recoverable as an "investigation cost" pursuant to subsection (b)(4). The government argues that this cost was a "direct and foreseeable" result of the conspiracy at issue, and that it is therefore

---

[13]The billing rates for Arkin were substantially similar.

recoverable. On this issue, the Court agrees with the defendants. Although the NBA's desire to respond publicly when this conspiracy came to light was foreseeable, it is only foreseeable steps taken for the purpose of assisting the government in the investigation or prosecution of the offense that are recoverable pursuant to subsection (b)(4), the specific provision under which these fees are sought. See United States v. Goldstein, No. 07-151, 2008 WL 659676, at *3 (D. Hawaii March 11, 2008) (attorneys' fees for dispute resolution process resulting from the offense not recoverable as an investigation cost because it was unrelated to the government's investigation and/or prosecution of the offense). Accordingly, the Court holds that the attorneys' fees relating to the NBA's public response are not recoverable pursuant to subsection (b)(4), and the award will be reduced by the $10,800 that Mr. Anders billed for August 13, 14, and 15.[14]

In sum, the NBA is entitled to a total award of $139,993 for attorneys' fees incurred pursuant to its effort to assist the government in the investigation and prosecution of these offenses, and for attendance at proceedings related to these offenses.

ii.    Apportionment

The restitution statute would allow for all three defendants to be liable for the total amount of $139,993 jointly and severally. However, in its discretion, the Court may apportion liability in the interest of fairness. The defendants have identified certain costs that might be appropriately apportioned to one or two defendants, rather than jointly and severally to all three:

---

[14]A careful review of the records submitted indicates that it is possible that Mr. Anders did more than just prepare the NBA's public response to the guilty plea on these dates. However, the government has not even attempted to divide these charges into recoverable and unrecoverable portions, and an attempt by the Court to do so would require pure speculation. Accordingly, the government has not established by a preponderance of the evidence that any of this $10,800 is recoverable, and it will be excluded in its entirety.

(1) the cost of the portion of the investigation that was dedicated to Donaghy's 2003-06 conduct, rather than the 2006-07 conspiracy; (2) the cost associated with the October 2007 document subpoena served on the NBA; (3) the cost of preparing the NBA's June 5, 2008 letter to the Court regarding certain statements made by Donaghy during these proceedings; (4) the cost of the NBA sending outside counsel to various proceedings in these two cases; and (5) the costs associated with preparation for the anticipated trial of Battista and Martino. In the interest of justice, the Court will allocate these costs to the appropriate defendant or defendants.[15]

The first three of the costs listed above should be apportioned to defendant Donaghy. First, the cost of assisting the government in investigating Donaghy's 2003-06 conduct, which did not involve Battista and Martino, is most fairly apportioned only to Donaghy.[16] Although determining the precise amount of the total investigation costs attributable to the 2003-06 time period is not possible, the Court believes that attempting to come up with a reasonable estimate of those costs and attributing them only to Donaghy is a more just result than holding Martino and Battista jointly and severally liable for the cost of investigating conduct in which they were not implicated. It was for this reason that the Court ordered the government to provide the most

---

[15]To the extent that the defendants argue that they may not be ordered to pay costs that are not clearly attributable specifically to their own prosecution, such an argument is rejected. The government has established, by a preponderance of the evidence, that the NBA paid $139,993 to assist the government in the prosecution of these offenses. To the extent that the records lack sufficient specificity as to which defendant each and every dollar is attributable to, the default is to impose liability jointly and severally, rather than require the victim to bear the cost. See Fogel, 494 F. Supp. 2d at 139-40.

[16]Although the court has held that the "losses" caused by Donaghy's 2003-06 conduct is not recoverable pursuant to subsection (b)(1), the costs incurred by the NBA in assisting the government's investigation of this time period were foreseeable given the nature of offense of conviction and are therefore recoverable pursuant to subsection (b)(4). Donaghy has not made an argument to the contrary.

accurate estimation possible regarding the percentage of the document requests and witness interviews that were attributable to the 2003-06 Donaghy/Concannon scheme, rather than the 2006-07 Donaghy/Battista/Martino conspiracy. In its July 17, 2008 letter to the Court, the government stated that its best estimate was that 25% of the witness interviews and documents related to the 2003-06 conduct. The Court believes that this fairly translates to an equivalent percentage of the attorneys' time in obtaining, reviewing, and producing these documents and preparing the witnesses. Accordingly, after all other apportionments have been made, the Court will take 25% of the amount remaining designated as "joint and several" and apportion it to Donaghy, while the other 75% will be the amount that remains joint and several for all defendants.

Second, the October 2007 document subpoena served on the NBA related only to Donaghy. The government agrees with Battista and Martino that Donaghy alone should bear this cost, but disagrees as to the amount. Battista and Martino claim that the amount attributable to the subpoena is $22,280, while the government claims that it is $13,500. Neither party explains how they arrived at these figures, making it necessary for the Court to conduct an independent review of the time records and affidavits to determine which entries are clearly attributable to the subpoena. It appears that the cost of the document production was $13,600, broken down as follows: (1) fifteen hours for associate Won S. Shin at $500 per hour, totaling $7,500; (2) four hours for partner David Anders at $700 per hour, totaling $2,800; (3) sixteen hours for paralegal Elizabeth Hendee at $200 per hour, totaling $3,200; and (4) one half-hour for

paralegal Elana Rakoff at $200 per hour, totaling $100.[17] In other October 2007 entries, two Wachtell attorneys, David Anders and his associate Joshua Naftalis, prepared for and attended an October 22, 2008 meeting with the government regarding these cases. Presumably Battista and Martino assume that this cost is attributable to the document subpoena. However, there is insufficient evidence in the record to establish that this meeting related to the document subpoena or otherwise related exclusively to Donaghy. Accordingly, only $13,600 for the October 2007 document subpoena will be apportioned to defendant Donaghy.

Third, the NBA, with the assistance of outside counsel, prepared a letter to this Court, dated June 5, 2008, responding to several statements made by Donaghy's counsel during the course of these proceedings that the NBA believed were inaccurate. The government agrees that these costs should be apportioned only to Donaghy. The cost of this letter was $7,600, broken down as follows: (1) six and two-tenths hours for associate Won S. Shin at $500 per hour, totaling $3,100; and (2) six hours for partner David Anders at $750 per hour, totaling $4,500.

Next, each defendant should alone bear the cost of the NBA sending attorneys to proceedings that related exclusively to them.[18] First, associate Jonathan E. Goldin spent two hours, at $380 per hour, traveling to and from and attending Donaghy's plea hearing. Accordingly, $760 shall be apportioned to Donaghy.[19] Second, on April 10, 2008, associate

---

[17]Because the government claims that the proper amount to apportion to Donaghy for the document subpoena is $13,500, the Court assumes that it overlooked the one half-hour billed by Rakoff.

[18]Subsection (b)(4) explicitly allows for recovery of the costs of "attendance at proceedings related to the offense."

[19]While the government argues that all of the defendants should bear the cost, jointly and severally, of outside counsel's attendance at Donaghy's guilty plea, it then attributes the cost incurred by the NBA in sending outside counsel to several Battista/Martino conferences only to

Won Shin attended a status conference that related to Battista and Martino, but not Donaghy. She spent two-and-a-half hours, at $500 per hour, traveling to and from and attending the conference. Accordingly, $1,250 shall be apportioned to Battista and Martino, jointly and severally. Third, on April 16, 2008, associate Shin spent two-and-a-half hours, at the same rate, traveling to and from and attending Martino's plea hearing. Accordingly, $1,250 shall be apportioned to defendant Martino. Fourth and finally, on April 21 and 24, associate Joshua Naftalis attended a status conference relating only to Battista and Battista's plea hearing, respectively. This time totaled five hours at $580 per hour, totaling $2900. This cost will be apportioned to defendant Battista.

In addition, the government agrees that the investigation costs that were incurred between April 10, 2008 and April 28, 2008 related only to Battista and/or Martino, and not to Donaghy. Because Martino pled guilty on April 16, 2008, eight days before Battista, any trial preparation that can be attributed to those days should be apportioned only to Battista. Costs dating from April 10, 2008 to April 16, 2008, and other April 2008 costs that can be attributed solely to the Battista/Martino proceedings, shall be apportioned to the two of them jointly and severally.

First, associate Joshua Naftalis billed five hours, at $580 per hour, totaling $2,900 for April 6, 7, and 8, 2008. Although this is not within the April 10 through April 28 time-frame discussed by the parties, Mr. Naftalis' affidavit states that on these dates he "prepared a witness for a meeting with the United States Attorneys' Office in connection with his expected testimony in the trial of James Battista and Thomas Martino." (Naftalis Aff. ¶4(b).) Accordingly, this cost

_____

Battista and Martino. The Court will resolve this inconsistency by apportioning the cost of counsel attending a hearing to the defendant to whom the hearing related, which seems to be the most equitable result.

will be apportioned to Battista and Martino, jointly and severally. Second, on April 11, 2008, associate Won Shin billed two hours, at $500 per hour, totaling $1,000, that will be apportioned to Battista and Martino jointly and severally. Third, on the same date, paralegal Elana Rakoff billed two-and-a-half hours at $200 per hour, totaling $500, that will be apportioned to Battista and Martino jointly and severally.

Fourth and finally, partner David Anders billed a total of 16 hours on various dates in April of 2008, for a total of $12,000, which he describes in his affidavit as "considerable time responding to requests from the government relating to the expected trials of Battista and Martino."[20]  (Anders Aff. ¶8.)  He further provides that this time was spent coordinating witness preparation sessions and overseeing additional document requests.  Of the 17 dates on which Anders made a billing entry pursuant to this work, six are for after April 16, 2008, the date on which Martino pled guilty.  However, because the NBA only seeks restitution for sixteen of the hours that Anders billed to the NBA during April of 2008, and not his total of twenty-six hours, and because the sixteen hours are not attributed to particular billing entries, it is impossible to determine from the records how much of the sixteen hours for which restitution is sought was billed after April 16, 2008.  But a reasonable estimate can be made.  Here, the six entries for dates after April 16 represent just over 33% of Mr. Anders' twenty-six total billable hours for April.  Taking the total, $12,000, and multiplying by that percentage, the Court arrives at a figure, rounded to the nearest dollar, of $4,000.  Accordingly, of the $12,000 billed by Anders during April of 2008, $8,000 will be apportioned to Battista and Martino, jointly and severally,

---

[20]As was the case with Joshua Naftalis, some of Mr. Anders' entries date prior to April 10.  However, Anders explicitly states in his affidavit that all of this work related exclusively to the anticipated trials of Battista and Martino, and, therefore, it will be apportioned to them.

and $4,000 will be apportioned to Battista alone.

For all of the foregoing reasons, the NBA will be awarded $139,993 with respect to the

attorney's fees, to be apportioned as follows:

A.  Amounts apportioned only to Donaghy (not including the 25% for investigation into his
    2003-06 conduct):
    1.   October 2007 document subpoena:            $13,600;
    2.   June 5, 2008 letter regarding statements:   $7,600
    3.   Attendance at Plea Hearing:                 $760
                                          Total:     $21,960
B.  Amounts apportioned to Battista and Martino, jointly and severally:
    1.   Attendance at April 10, 2008 Status Conference:   $1,250
    2.   Naftalis Trial Preparation:                $2,900
    3.   Shin Trial Preparation:                    $1,000
    4.   Rakoff Trial Preparation:                  $500
    5.   Anders Trial Preparation:                  $8,000
                                          Total:    $13,650
C.  Amounts apportioned to Martino only:
    1.   Attendance at April 16, 2008 Guilty Plea:  $1,250
                                          Total:    $1,250
D.  Amounts apportioned to Battista only:
    1.   Attendance at April 21 and 24 Status Conference
         and Guilty Plea:                           $2,900
    2.   Anders Trial Preparation:                  $4,000
                                          Total:    $6,900

Accordingly, the total amount apportioned, before the additional 25% to Donaghy, is

$43,760, leaving $96,233 of the original total unapportioned. Apportionment to Donaghy for the

investigation into the 2003-06 conduct is therefore 25% of $96,233, or $24,058.25, to be

subtracted from $96,233 and added to the $21,960 already apportioned to Donaghy. This leaves

$72,174.75 of the attorney's fees to be apportioned jointly and severally among all three

defendants, and increases the amount for which Donaghy is solely responsible to $46,018.25.

The apportionment for the attorneys' fees shall be:

    1. Jointly and severally as to all three defendants: $72,174.75;
    2. Jointly and severally as to Battista and Martino: $13,650;

3. Donaghy only: $46,018.25 ($21,960 plus $24,058.25);
4. Battista only: $6,900;
5. Martino only: $1,250.

b.     Cost of Reviewing Game Film

Finally, the NBA seeks restitution in the amount of $9,930.02, for the cost of the time

NBA employees spent reviewing tapes of games that Donaghy refereed, at the government's

request.  Only Donaghy challenges this request, acknowledging that these costs are generally

recoverable under the law, but that, in this case, these efforts were redundant in light of the

NBA's practice of having an observer monitor the refereeing of each and every game at the time

it is played.  He further argues that rather than do this work over again, the NBA could have

simply turned over the documentation that must have accompanied the original efforts, and that

this would have satisfied the government's request.  The Court disagrees with Donaghy's

position.  The NBA was asked, by the United States government, to perform a specific task to

assist in its investigation.  It was for the government to determine whether reviewing these game

tapes with the benefit of hindsight was an appropriate investigative step.  The Court will not

deny a crime victim restitution for the costs of performing a specific task at the government's

request merely because that defendant wishes to second-guess the manner in which the

government choose to conduct its investigation of him.  Accordingly, with respect to the costs of

reviewing game film, the NBA is awarded $9,930.02, to be apportioned jointly and severally

among all three defendants.

III.    Conclusion

For the foregoing reasons, the NBA is entitled to restitution in the total amount of

$217,266.94, broken down among the three defendants as follows:

      1. Jointly and severally as to all three defendants:

| | | |
|---|---|---|
| a. | For Donaghy's Compensation: | $67,343.92 |
| b. | For Attorney's Fees: | $72,174.75 |
| c. | For Review of Game Film: | $9,930.02 |
| | Total: | $149,448.69 |

      2. Jointly and severally as to Battista and Martino: $13,650;

      3. Donaghy only: $46,018.25;

      4. Battista only: $6,900;

      5. Martino only: $1,250.

At the sentencing of each defendant the Court will set a payment schedule according to

which restitution is to be paid in consideration of the factors set forth in 18 U.S.C. § 3664(f)(2).

The parties should be prepared to address those factors.

SO ORDERED

Dated: Brooklyn, New York                     Carol Bagley Amon

      July 23, 2008                          United States District Judge